UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| KENNETH BLOCK; MODERATE PARTY OF RHODE ISLAND; and MODERATE PARTY OF RI PAC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No.  09-047 S |
| A. RALPH MOLLIS, Secretary of the State of Rhode Island, in his official capacity; ROBERT KANDO, Executive Director of the Rhode Island Board of Elections, in his official capacity; and PATRICK LYNCH, Attorney General of the State of Rhode Island, in his official capacity, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**DECISION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

This case calls into question the constitutionality of a provision of R.I. Gen. Laws ch. 17-1-2(9), which prescribes how an organization can become a recognized political party in Rhode Island.   The Moderate Party of Rhode Island seeks to enjoin enforcement of the January 1 start date for voter signature collection to qualify by petition, and the related requirement that a prospective party collect signatures equaling 5% of the number of votes cast in the preceding gubernatorial or presidential general election.   Following a consolidated non-jury trial[1] and injunction

_____

[1] Two witnesses testified: Plaintiff Kenneth Block and Janet Ruggiero, the Director of Elections in Rhode Island.

hearing, <u>see</u> Fed. R. Civ. P. 65(a)(2), and after consideration of the parties' written submissions, for the following reasons the Court concludes that the 5% threshold, while onerous, is constitutional, but that the January 1 start date is not.

I.   <u>Findings of Fact</u>

The material facts are essentially undisputed.  The Moderate Party of Rhode Island is an unincorporated voluntary association of citizens who wish to nominate candidates for elective office in Rhode Island as an officially recognized political party. Importantly, its goal at this early stage is to support and nominate candidates primarily for legislative office in the 2010 general election.  The Moderate Party of Rhode Island PAC is a political action committee registered with the Rhode Island Board of Elections.  Plaintiff and Rhode Island resident Kenneth Block is the founder and ringleader of these groups.  He is one of three members of the Moderate Party's Executive Committee, one of three members of the Moderate Party Working Group, and Chairman and Treasurer of the PAC.[2]

The Moderate Party got its start in late 2007, sparked by a letter from Mr. Block to the Providence Journal, which was subsequently referenced in an op-ed column.  Following some favorable reaction to his ideas, Mr. Block did what any modern

---

[2] According to Mr. Block, the Moderate Party of Rhode Island is not affiliated at this time with any national organization.

2

Thomas Paine might be expected to do -- he created a Moderate Party website.   In January of 2008, he hired a company to conduct a statewide poll in an attempt to ascertain whether voters would be receptive to the idea of a Moderate Party and/or a new political party.   Mr. Block was enthused by the poll results and, in the spring of 2008, a small group of individuals (including Mr. Block and a well known former Rhode Island Attorney General and talk show host, Arlene Violet) issued a platform on "core" issues.   They formed an executive committee, and updated the website to allow citizens to register and receive information.

In the 2008 election, the Moderate Party formally, if modestly, entered the world of Rhode Island politics.   It endorsed thirteen candidates for the state General Assembly and held two fund-raising events.   The PAC was used as a fund-raising vehicle to receive donations and support candidates whom the Moderate Party endorsed.   To date, it has raised between six and eight thousand dollars.   The Moderate Party issues press releases through its website and allows citizens to register; approximately 600 have registered to date.   It recently ran a local radio advertisement. There is no Moderate Party office and no paid staff, though Mr. Block refers to 40-50 of the registered individuals as "activists" who have expressed willingness to perform work on the organization's behalf.

II.   Statutory Scheme

R.I. Gen. Laws § 17-1-2(9) provides three avenues for gaining recognition under Rhode Island's definition of "political party" or "party."  The full text of the statute is set forth below in order to place the present issue in proper context; Plaintiffs have directed this challenge to the petition process in subsection (iii):

> "Political party" or "party" means: (i) any political organization which, at the next preceding general election for the election of general officers, nominated a candidate for governor, and whose candidate for governor at the election polled at least five percent (5%) of the entire vote cast in the state for governor, or (ii) any political organization which at the next preceding general election for the election of a president of the United States nominated a candidate for president and whose candidate for president at the election polled at least five percent (5%) of the entire vote cast in the state for president, or **(iii) any political organization which, on petition forms provided to the chairperson of the organization by the state board of elections, obtains the signatures and addresses of that number of registered qualified voters equal to five percent (5%) of the entire vote cast in the state for governor or president in the immediately preceding general election. All the signatures must be obtained no earlier than January 1 of the year in which the political organization desires to place a candidate or candidates on any ballot as a "party" candidate.** If the political organization wishes to select its nominees in a primary election, the petitions, bearing the requisite number of valid signatures, shall be presented to the appropriate local boards of canvassers no later than June 1 of the same year.  If the petitions are validated by the local boards as containing the requisite number of valid signatures, the political organization shall be deemed to be a political party for all elections held during the year and may select its nominees in a primary election. **If the political organization does not wish to select its nominees in a primary election, then the petitions need**

4

**not be returned to local boards of canvassers until August 1 of the same year.** An organization qualifying as a political party through the petition process shall qualify as a political party only during the year in which signatures are obtained unless the candidates for governor or president of the United States of the party at a general election held in the year, shall receive five percent (5%) of the vote as provided in this subdivision for either governor or president of the United States. If the candidates do not receive five percent (5%) of the vote, the organization shall no longer qualify as a political party unless and until it shall, in a subsequent year, once again qualify by the submission of petitions;

In sum, the statutory framework under subsections (i) and (ii) provides that an organization can run a candidate for Governor or President as an independent with a party designation next to his or her name. If the candidate obtains at least 5% of the vote in the election, the party with whom he or she is affiliated on the ballot becomes a "political party" for the next election cycle. Subsection (iii) allows an organization to be recognized as a political party if it can demonstrate sufficient support during an election year (commencing not before January 1 of such year). This petition method requires the putative party to collect voter signatures equal to 5% of the vote in the prior election for Governor or President. If such party wishes to hold a primary, signatures are due by June 1; if no primary is held, the due date is August 1 (in anticipation of a November election).[3] Regardless

---

[3] The Moderate Party did not disagree with the State's assumption that no Moderate Party primary would likely be held; thus, the Court too proceeds under a January 1 - August 1 period.

of how recognition is obtained, every party is subject to an ongoing retention requirement: to maintain party status, a party's candidate must poll at least 5% of the vote for either Governor or President.  If he or she fails to do so, the party drops to square one, and must once again either run an independent candidate with a party designation for President or Governor in the next election (and obtain 5% of the vote), or repeat the petition process.  In its original (pre-1994) form, R.I. Gen. Laws § 17-1-2(9) contained only one method of achieving party status, that which now appears as subsection (i) - obtaining 5% of the gubernatorial vote.  In 1994, subsections (ii) and (iii) were added.  Since then, no organization has become a political party in Rhode Island via the petition process, though at least three have obtained recognition by way of subsections (i) or (ii).[4]

III. <u>The Controversy</u>

The Moderate Party seeks recognition as a political party.  It desires not only ballot access in 2010, but also what the State concedes are the undeniable benefits of statutory recognition, including formal voter affiliation and advantageous campaign financing and fundraising rules.  To that end, under the current

---

[4] In 1994, Robert Healey on behalf of the Cool Moose Party polled at least 5% of the vote for Governor.  In 1996, Ross Perot on behalf of the Reform Party polled at least 5% of the vote for President.  In 2000, Ralph Nader on behalf of the Green Party polled at least 5% of the vote for President.  It appears, however, that no party has retained official status under the statute by continuing its success into the next election cycle.

6

rubric, its only available path is (iii) -- the petition process.[5] Commencing January 1, 2010, the Moderate Party would need to collect signatures from 23,588 registered voters, or 5% of the 471,766 Rhode Islanders who voted in the 2008 presidential election.   The cut-off date by which signatures would have to be submitted would be August 1, 2010.   There is no dispute that on estimate, Plaintiffs would have 210 days to collect 23,588 signatures to achieve initial recognition as a party.

Plaintiffs filed this action on February 3, 2009 pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201, seeking a declaratory judgment that R.I. Gen. Laws 17-1-2(9)(iii) violates their rights under the First and Fourteenth Amendments to the United States Constitution, and requesting that the Court permanently enjoin the State from enforcing subsection (iii) of § 17-1-2(9).

## IV.  Discussion

Plaintiffs object to the 5% numerical signature requirement and January 1 collection start date, separately and as they work in tandem.   Before turning to the merits, however, a threshold standing challenge must be addressed.

### A.  Standing

The State maintains Plaintiffs lack standing to mount this constitutional challenge.   The crux of the argument is that the

---

[5] The Moderate Party has never been the designated party for an independent gubernatorial or presidential candidate in Rhode Island, much less one who polled 5% of a vote.

Moderate party has not yet suffered a concrete injury, and that it is "mere conjecture and hypothesis" to say it would be unable to become a recognized party on the 2010 ballot.  Put another way, the State contends the Moderate Party is no more than "a few people sitting around a coffee table in Barrington [Rhode Island]."  (See Trial Tr. 121:9-11, Apr. 30, 2009.)

Without question, "standing to sue is an indispensable component of federal court jurisdiction." Osediacz v. City of Cranston, 414 F.3d 136, 139 (1st Cir. 2005).  Would-be plaintiffs must show (a) that they have suffered an injury in fact; (b) that such injury is fairly traceable to the conduct complained of (some causal connection); and (c) that the relief sought is likely to redress the injury sustained.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

The Moderate Party satisfies these core requirements.[6]   The injury claimed is neither too remote nor speculative to confer standing.   The Moderate Party offered evidence of a specific intention to begin collecting signatures in anticipation of the 2010 election.  These are not vague, "some day" ruminations of concerned citizens -- they are current, concrete plans by an organized group that has already participated in Rhode Island

_____

[6] Though the issue was only raised in passing, it is unclear whether Mr. Block and the PAC have the same concrete injury sufficient to confer standing in their own right.  For all intents and purposes, however, their interests are indistinguishable from (and really subsumed by) the Moderate Party on these facts.

politics by endorsing candidates, expended substantial personal
resources and engaged in organized grassroots political activity.
Lujan, 504 U.S. at 564.   Indeed, the First Circuit has recognized
that an intention to undertake certain activity can suffice to
establish standing for "certain types of facial challenges to
statutes, ordinances, regulations, or governmental policies."
Osediacz, 414 F.3d at 140-41.   This is just such a challenge.
Moreover, it is undisputed that a favorable decision would redress
the claimed injury by easing the 5% threshold and allowing
signature collection to begin immediately in advance of next year's
election.   Given the direct chilling effect on Plaintiffs' pre-
election efforts to associate, and the line of authority in ballot
access cases affording standing even when plaintiffs have not yet
attempted to collect signatures or otherwise comply with a statute,
the Moderate Party more than satisfies the "constitutional minima"
to press its claim.   Id. at 141.[7]

B.   <u>Challenges to State Election Laws</u>

Restrictions on access to the ballot and party recognition
trigger two fundamental rights: "the right of individuals to
associate for the advancement of political beliefs, and the right

---

[7] The State would have this Court employ a "wait and see
approach" and require the Moderate Party to (as of January 2010)
try the petition process and fail before challenging the definition
of "political party" in Rhode Island.   But waiting for such an
attempt within the statute's parameters would be futile by way of
resolving this facial attack on § 17-1-2(9)(iii).

of qualified voters, regardless of their political persuasion, to cast their votes effectively." Williams v. Rhodes, 393 U.S. 23, 30 (1968). Of course, these limitations "strike at the heart of representative government" and warrant careful consideration. Reynolds v. Sims, 377 U.S. 533, 555 (1964); see Norman v. Reed, 502 U.S. 279, 288 (1992) ("For more than two decades, this Court has recognized the constitutional right of citizens to create and develop new political parties.").

Nonetheless, the right to associate for political purposes through the ballot and vote are by no means absolute. Burdick v. Takushi, 504 U.S. 428, 433 (1992). Rather, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." Id. It is beyond cavil that states have an interest in ensuring fair and orderly elections, and maintaining the integrity of the ballot through reasonable restrictions. See U.S. Const. art. I, § 4, cl. 1 (states shall prescribe the time, place, and manner of holding elections); Storer v. Brown, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."). The balance, then, pits permissible election regulation against unjustified curtailment of First and Fourteenth Amendment rights.

The United States Supreme Court has forgone a "litmus-paper test" for determining the lawfulness of election laws in favor of a more flexible measuring stick. Anderson v. Celebrezze, 460 U.S. 780, 789 (1983) (quoting Storer, 415 U.S. at 730); see Werme v. Merrill, 84 F.3d 479, 483 (1st Cir. 1996). This test prompts the Court back and forth on a sliding scale, where the applicable level of scrutiny corresponds to the constitutional burden: the lighter the burden, the more forgiving the scrutiny; the heavier the burden, the more exacting the review. When a law imposes only reasonable, nondiscriminatory restrictions on individual rights, the burden is slight, and the State's regulatory interests are, in the normal course, sufficient to justify the constitutional restraint. Burdick, 504 U.S. at 434. However, if the restrictions are severe, the burden is great, and the law must be narrowly drawn to advance a "state interest of compelling importance." Norman, 502 U.S. at 289. Thus, the "[d]ecision in this area of constitutional adjudication is a matter of degree." Clements v. Fashing, 457 U.S. 957, 963 (1982); see Anderson, 460 U.S. at 789:

> [The Court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

With this backdrop, the Court must examine the nature of the burdens imposed on the Moderate Party, and the State's justification for the two signature petition restrictions at issue.

C.   <u>The 5% Signature Requirement</u>

Plaintiffs charge that requiring a prospective party to collect signatures equaling 5% of the vote from the prior election presents too high a threshold for any new party to achieve.  Though the State proffers the familiar "go-to" concerns about ballot clutter and confusion, Plaintiffs say at bottom the purported rationale rings hollow and cannot justify such a high hurdle.

For starters, there is no denying that the signature petition process in Rhode Island is among the most difficult in the United States.  Indeed, the State concedes it "has a very stringent petition statute." (<u>See</u> Trial Tr. 123:2-3, Apr. 30, 2009.)[8]  There is also no denying, however, that as a general proposition, the 5% figure has received the stamp of constitutional approval in numerous ballot access challenges dating back four decades, albeit with varying circumstances.  <u>See</u>, <u>e.g.</u>, <u>Am. Party of Texas v. White</u>, 415 U.S. 767, 789 (1974) ("Demanding signatures equal in

_____

[8] By agreement, the parties submitted without objection (and the Court much appreciates) a handful of charts and graphs along the lines of a ballot access 50 state survey of the law.  In passing (though it has no bearing on the outcome here), the Court notes that at least some members of the General Assembly deem Rhode Island's statute too stringent: legislation was recently filed to eliminate the petition start date and lower the number of signatures from 5% to 1%.

12

number to 3% or 5% of the vote in the last election is not invalid on its face."); Storer, 415 U.S. at 739-40 (5% requirement not facially unconstitutional); Jenness v. Fortson, 403 U.S. 431, 438-39 (1971) (upholding Georgia statute requiring signatures of 5% of registered voters before independent candidate could be placed on ballot); Rainbow Coalition of Okla. v. Oklahoma State Election Bd., 844 F.2d 740, 741-42, 744 (10th Cir. 1988) (upholding Oklahoma statute requiring signatures of 5% of the number of votes cast in most recent election).

Against such authority, this Court cannot conclude that the 5% requirement in subsection (iii) intrudes in a significant manner the rights of the Moderate Party. The task of collecting 23,588 signatures, standing alone, is not massive for a fledgling political body.[9] Because the burden is modest, the State's "important state interest . . . in avoiding confusion, deception, and even frustration of the democratic process" is sufficient to justify the limitation on associational and voting rights. Jenness, 403 U.S. at 442. That is not to say, however, that 5% is a walk in the park, or that Rhode Island's interest in ensuring

---

[9] The Court is not unsympathetic to the fact that while the extraordinary voter turnout in the 2008 election of President Barack Obama was, by all accounts, a positive showing of the country's democracy at work, the realty for the Moderate Party is that the number of required signatures in 2010 is now considerably higher than in years past. But this fact does nothing to change the calculus.

"some preliminary showing of a significant modicum of support"[10] would not be served by a lesser percentage (as appears to be the case in the many other states using a 1-3% threshold). Id. This Court can surmise perhaps that one of the reasons for the high hurdle is to keep potential challenges to comfortable incumbents to a minimum. Even so, when the judgment of the legislature remains within the constitutional playing field, as it does with the fixed 5% figure, it is not this Court's role to re-write the legislature's handiwork based on a comparison to what other states have enacted. See Libertarian Party of Florida v. Florida, 710 F.2d 790, 794 (11th Cir. 1983) ("A court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature.").

D.   Signature Collection Start Date

The more serious challenge in this case is to the January 1 signature collection start date. Plaintiffs are "ready, willing and able to commence collecting the necessary signatures for recognition now" but must "sit on the sidelines" for a full calendar year before the collection period commences in January 2010. Such an artificial trigger, they argue, puts the Moderate Party at a distinct disadvantage compared to the "major" parties in

---

[10] This oxymoronic standard ("significant modicum") would be hard to define with precision, but fortunately there is no need to so here.

14

Rhode Island because it has no way to effectively participate in and contribute to the state-wide election during the remainder of 2009 and 2010, particularly with respect to the overwhelmingly Democratic General Assembly. Plaintiffs suggest that if allowed to collect signatures beginning immediately, they would achieve party status and be able to fundraise and spend accordingly when it counts -- in the months leading to the election. As it stands, however, Plaintiffs will be collecting signatures during this crucial period; by the time they get done, it will be too late to do much recruiting, fundraising and electioneering.

The State takes a different view. Though again it concedes the January 1 start date and resulting limited time window is an aberration compared to most other states, the State claims it is not an undue burden for a prospective party and, in any event, is justified by the desire for "good and fresh" voter signatures on the petition, as opposed to "old and stale" signatures.

In the usual course, the first step of analysis is to determine whether the January 1 start date imposes a reasonable and nondiscriminatory restriction, or whether it constitutes a severe restriction so as to trigger a more demanding review. <u>Anderson</u>, 460 U.S. at 789; <u>see also</u> <u>Pérez-Guzmán v. Gracia</u>, 346 F.3d 229, 238-39 (1st Cir. 2003). Here, however, it is unnecessary to

definitively categorize the burden one way or another.[11]  This is
because under any level of scrutiny, the State has come forward
with no legitimate regulatory interest whatsoever that would
necessitate placing this enormous speedbump on the path to party
recognition (much less shown any such interest is of "compelling
importance" or that the January 1 start date is the most narrowly
tailored means available to protect that interest).  Norman, 502
U.S. at 288-89.

Before addressing the State's asserted rationale, it is useful
to sketch out in a little more detail the timeline imposed.
Following a gubernatorial or presidential election in which a want-
to-be political party does not have an independent candidate
designee, it must wait during an "off" election year -- in this
case 2009 -- without the benefits of official recognition.  On the
first business day following January 1, 2010, it would pick up
petition forms at the State Board of Elections and begin collecting
signatures.  By or on August 1, 2010, it would submit, as a
practical matter, a surplus of the 23,588 signatures needed (as
invalidations are likely) to the local boards of canvassers of the
39 cities and towns in Rhode Island.  According to Ms. Ruggiero,
the local boards would verify the number of valid signatures, and
then finally the Secretary of State's office would authenticate the

---

[11] The comparative data would suggest the Rhode Island scheme
is probably the most onerous in the nation, so at least a strong
argument can be made that the restriction is on the severe side.

numbers and certify the petition result "sometime" before the November 2010 election.[12]

The sole rationale the State offers for the January 1 start date is its interest in ensuring that petition signatures are valid; for example, that the signatories are not voters who have moved or died.  Ms. Ruggiero explained that during an off-election year, the State performs a central voter registration system "clean up" whereby it deletes or adds individuals who have changed address, become active or inactive, etc.  If a minor party is allowed to use voter signatures in an off-year, the State argues, it will be working off the outdated list -- so the likelihood that signatures are invalid is increased.

This justification is nonsensical.  First, what is described as the so-called State interest is really a Moderate Party interest -- if anyone is to be harmed by use of a "stale" voter list in the collection process prior to January 1, 2010, it is the putative

---

[12] Ms. Ruggiero testified that a candidate for the ballot in 2010 needs to declare under a particular party during the "declaration of candidacy" period in June 2010.  Thus, this suggests that under the current framework a candidate potentially affiliating with the Moderate Party in 2010 could not formally do so, because the party would not yet be recognized.  This is another example of how the arbitrary start date is not a de minimis interference and impedes the realistic progress of a minor political party.  Ms. Ruggiero testified that the Board of Elections "might" consider allowing a candidate to declare given a minor party's "pending" status, but, understandably, Plaintiffs are unsatisfied with this answer.  The Court agrees: constitutional rights should not ebb and flow with the bureaucratic tides of state government.

party seeking the signatures.  If an organization wishes to work off data that may not be current, it does so as its own risk. Moreover, using the old list simply means some greater margin may be needed to cover the potentially larger number of invalid signatures.  But that is the party's problem, not the Board of Elections'.  And, most importantly, the benefit of additional time for collecting signatures more than outweighs the marginal burden to the party of collecting a few more signatures.  In other words, the process is self regulating: if the new party is worried that it will get stale signatures by starting too early, then it will wait. It does not need an artificial statutory date to make it do so.

Second, and most important, the State already has a regulation directly aimed at this issue: the check on the validity of signatures by the local boards of canvassers.  No evidence, statistical or otherwise, was offered to support the proposition that the percentage of invalid signatures obtained by petition somehow decreases if signatures are collected after the voter database is updated.  Indeed, Ms. Ruggiero acknowledged there are many reasons signatures could be invalid other than voters not being properly registered (Trial Tr. 102:15-17), and that in a recent petition for an independent candidate for senator, approximately 300 of 1600 signatures collected after the clean up process were invalidated.  The point is that the State fails to provide the Court with an adequate justification for a January 1

18

start date that needlessly hampers the ability of a political organization to compete in a meaningful way in an election year leading up to the actual election date.  See Anderson, 460 U.S. at 789 (after identifying and evaluating the "precise" interests put forward by the State, court must consider the extent to which those interests make it necessary to burden plaintiff's rights).

Finally, the State maintains it need only provide one constitutional path to party recognition, and invites the Court to rubber stamp either or both of the "independent candidate" paths of subsections (i) and (ii), as if this makes the question of the constitutionality of the January 1 start date (and petition process as a whole) irrelevant, a kind of statutory "cherry on top" -- nice to have, but not necessary to the dish.[13]   The State's counsel articulated the theme as follows:

> With all due respect, let the Moderate Party run somebody for governor in 2010.  This is the perfect election to do it.   There's so much interest in this gubernatorial election and interest in the future of our nation and especially our state, which is why we're here today.  Run a candidate in 2010, have them get five percent of the vote, they'll be a political party.

(See Trial Tr. 128:1-7.)

---

[13] In the State's view, this would be a simple rubber stamp because the challenged statute was upheld as constitutional in Gill v. Rhode Island, 933 F. Supp. 151, 160-61 (D.R.I. 1996).   This argument proves too much, however, because Gill did not involve the statute post-1994 amendment.   The only provision challenged (and upheld) in Gill was the current subsection (i) -- 5% of the vote for Governor.   Because Gill had nothing to do with the petition process at issue here, it is of no help to the State.

This argument misses the point.  While some cases urge consideration of ballot access schemes in their entirety in some circumstances, Williams, 393 U.S. at 34, the problem with resorting to the so-called alternatives here is that they differ so significantly from the petition path the Rhode Island General Assembly created in the 1994 amendment.  See Storer, 415 U.S. at 745 ("[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other."); McLain v. Meier, 637 F.2d 1159, 1165 (8th Cir. 1980) ("A candidate who wishes to be a party candidate should not be compelled to adopt independent status in order to participate in the electoral process.").[14]

Subsection (iii) is the only means by which an organization can gain recognition and reap the undeniable benefits of official party status prior to an election.  In other words, no matter how successful the grassroots effort, a hopeful party must recruit a candidate of sufficient stature and means to mount a reasonably successful race for Governor (or President) before it can get into the General Assembly game.  But strong candidates with statewide approval and money are not exactly a dime a dozen, and nothing in the statutory scheme suggests that a candidate-centric approach

---

[14] Thus, the fact that others have obtained 5% of the vote in Rhode Island with independent designated candidates does not per se negate the burden the arbitrary January 1 start date imposes on organizations who have not had such a candidate.

should precede a petition-based approach. More lenient qualifications for individual independent candidates (who, tellingly, under R.I. Gen. Laws § 17-19-9.1 earn a second place spot on the ballot by lottery "following" the listing of official party candidates, with the name of their "political principle, movement, or organization" in "small print" next to their name) does not make up for a constitutionally deficient petition process. See Am. Party of Texas, 415 U.S. at 783 ("The Constitution requires that access to the electorate be real, not 'merely theoretical.'") (quoting Jenness, 403 U.S. at 439); see Clements, 457 U.S. at 964 (court must inquire whether "challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity.'") (quoting Lubin v. Panish, 415 U.S. 709, 716 (1974)).

This distinction between obtaining ballot access through an independent candidate and non-election year party recognition and participation cannot be overstated. Historically, so much of the value of a minor party lies in what it can do before an election: spark debate, introduce new ideas, educate voters, and challenge the status quo. The bedrock First Amendment principles implicated here are especially vital in a state such as Rhode Island, where the two major parties operate but where only one -- the Democratic Party -- increasingly dominates the legislative political

landscape.[15]  Society is best served when political parties outside

the two existing major parties play an active, "robust" role in the

entire campaign process -- not simply appear on the final election

ballot.  See Anderson, 460 U.S. at 794.

In short, the General Assembly may act as broadly or narrowly

as the will of the people demands or tolerates.  But the details of

a petition process added as an "alternative" do not circumvent

constitutional scrutiny just because they exist in addition to

other ballot access provisions that may be constitutional in their

own right.  Pointing the Moderate Party in a different direction in

this case would, in essence, allow the State to take away with one

hand what it provided with the other in 1994.[16]  The validity of the

---

[15] The current make-up of the Rhode Island General Assembly is
33 Democrats, 4 Republicans, 1 Independent (Senate); 69 Democrats,
6 Republicans (House of Representatives); for a total of 102(D),
10(R), 1(I).  See generally A. Ralph Mollis, Secretary of State,
The Rhode Island Government Owner's Manual, 2009-2010; see also
Edward Fitzpatrick, Goodbye and good riddance to 2008, Providence
J o u r n a l - B u l l e t i n ,   D e c .   2 8 ,   2 0 0 8 ,
http://www.projo.com/news/content/fitz_12-28-08_4JCPCJE_v3.b8a2c1
.html, ("The Nov. 4 [2008] election nearly cut the number of
General Assembly Republicans in half, leaving the GOP with just 10
of 113 seats - believed to be the lowest level in Rhode Island
history."); Michael Barone with Richard E. Cohen, The Almanac of
American Politics, National Journal Group, 2006, p. 1472-77 ("Rhode
Island is almost always one of the most Democratic states in
presidential elections" . . . "[Governor] Carcieri faced an
overwhelmingly Democratic legislature" . . . "[Governor] Almond had
lost control of spending because of the Democrats' huge majorities
in the legislature.").

[16] See Russell Garland, Five bills seek to prevent a repeat of
'92 ballot fiasco, Providence-Journal Bulletin, Feb. 11, 1994, at
9C (according to the sponsor of the amending legislation
Representative [now Congressman] James Langevin, prior to 1994 it

petition process should stand or fall on its own constitutional merits, and the Court eschews the State's invitation to issue an unnecessary declaratory judgment as to the constitutionality (or lack thereof, as the case may be) of subsections (i) and (ii) or all subsections in combination. See El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 494 (1st Cir. 1992) (courts should avoid premature adjudication of constitutional issues and address such questions only when absolutely necessary).

E.    5% and Signature Collection Start Date in Tandem

Extended discussion of the combination effect of the 5% and the January 1 start date would be superfluous.  Suffice it to say that while 5% alone passes constitutional muster, it cannot erase the lack of justification for the late start date.  Together, the two work an immediate injustice to Plaintiffs' rights not only to gain a ballot spot, but to accrue important benefits of official status during, if not prior to, an election year.[17]  And, despite the State's concern, the floodgates will remain closed to frivolous organizations that lack public support because of the still-

---

had been "next to impossible to establish a third party in Rhode Island").

[17] While not dispositive, Plaintiffs submitted evidence (and the State offered nothing to the contrary) that this petition combination is one of, if not the most, stringent in the country -- out of the handful of states with a 5% signature threshold, its window of time is the most restrictive; conversely, out of the handful of states with a set start date for signature collection, its 5% threshold is the most restrictive.

stringent 5% signature requirement and "one and done" framework whereby to retain its status, a party must effectively run a candidate for Governor or President or continuously demonstrate support via petition in every election cycle.[18]   In the context of minor parties, "[t]he States' interest in screening out frivolous candidates must be considered in light of the significant role that third parties have played in the political development of the Nation." Illinois Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 185 (1979); see also McLain, 637 F.2d at 1165 ("The remote danger of multitudinous fragmentary groups cannot justify an immediate and crippling effect on the basic constitutional right to vote for a third party candidate.").

---

[18] The legislature has made continuous party status, similar to what the Democrats and Republicans enjoy, almost impossible to achieve without running a candidate for Governor in each cycle. Mr. Block's goal of being primarily a "General Assembly" party may prove to be overly optimistic because to do so will require a petition effort in each election cycle.  Whether this is fair or good policy is not for this Court to decide.  But it does show that the Plaintiffs' burden is even greater because it is an ongoing burden -- one that would likely relegate them to a perpetual late start in the competition for money and votes, which in turn would ensure they never get too successful.  This too is somewhat ironic given that the other "major" party -- the Republican -- is frequently unable to muster candidates for the General Assembly. See Ian Donnis, RI '08: Prelude to 2010, The Phoenix, Oct. 31, 2008, available at http://thePhoenix.com/Boston/News/71208-RI-08-Prelude-to-2010/ ("The RI GOP has perpetuated its marginal status in the General Assembly by failing to run enough candidates in successive election cycles, and while there is some improvement this time around, the Republican effort isn't about to reorder the legislature.  In a situation that almost wholly favors Democrats, 15 of the elections for the 38-seat Senate feature only one candidate, and the same is true for 31 of the 75 House elections.").

V.    <u>Relief</u>

Plaintiffs request two forms of relief: first, that the Court declare the January 1 election year start date and 5% signature collection threshold unconstitutional and in derogation of the First and Fourteenth Amendments; and second, that the Court permanently enjoin all Defendants from enforcing these provisions of R.I. Gen. Laws § 17-1-2(9).  In effect, Plaintiffs seek to have the Court sever the portion (or portions) of the statute deemed unconstitutional, and prevent the State from rejecting signatures on behalf of a Moderate Party petition on the grounds that signatures were collected before January 1, 2010.

Severability is largely a matter of state law, <u>Leavitt v. Jane L.</u>, 518 U.S. 137, 139 (1996) (per curiam), and a court may strike a provision as unconstitutional and uphold the remainder when the unconstitutional portion is "not indispensable to the rest of the statute and can be severed without destroying legislative purpose and intent."  <u>Landrigan v. McElroy</u>, 457 A.2d 1056, 1061 (R.I. 1983); <u>see</u> <u>Regan v. Time, Inc.</u>, 468 U.S. 641, 652 (1984) (noting presumption in favor of severability, as "a court should refrain from invalidating more of the statute than is necessary").  Moreover, to issue a permanent injunction, the Court must find that (1) plaintiffs have suffered an irreparable injury; (2) remedies available at law such as monetary damages are inadequate to compensate for that injury; (3) the harm to plaintiffs outweighs

the harm defendants would suffer if an injunction were imposed; and (4) an injunction would not adversely affect the public interest. CoxCom, Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

In this case, the appropriate remedy is to strike the following sentence in R.I. Gen. Laws § 17-1-2(9): "All the signatures must be obtained no earlier than January 1 of the year in which the political organization desires to place a candidate or candidates on any ballot as a 'party' candidate." Gauging the legislative intent, it is reasonable to conclude that what is left of § 17-1-2(9) can remain fully operative in the absence of the January 1 start date (indeed, neither party argues otherwise).[19] And, it follows that Plaintiffs are entitled to injunctive relief as to enforcement of the January 1 start date by the Secretary of State's office, the Rhode Island Board of Elections, and any subsidiary agency or local town or city board of canvassers. The inability to begin collecting the requisite number of qualifying signatures in support of its petition has hampered the Moderate Party's ability to gain recognition for the 2010 election. Money damages are inappropriate, and the balance of hardships must tip in

---

[19] Though not conclusive, a severability provision supports this conclusion. See R.I. Gen. Laws § 17-1-8 ("If any provision of this chapter or its application to any person or circumstances is held invalid, the invalidity shall not affect other provisions or applications of the chapter which can be given effect without the invalid provision or application, and to this end the provisions of the chapter are declared to be severable.").

26

Plaintiffs' favor.   Finally, there is no doubt the citizens of Rhode Island will benefit from such an injunction, for it furthers meaningful participation and debate in the electoral process, and potentially helps avoid the serious dangers of the frozen political status quo.

VI.   Conclusion

There is no question "[t]he American song is one best sung by a plurality of voices." R.I. Chapter of Nat'l Women's Political Caucus, Inc. v. Rhode Island Lottery Comm'n, 609 F. Supp. 1403, 1413 (D.R.I. 1985). Without justification, a January 1 start date unduly silences would-be singers in Rhode Island at a critical stage of the democratic process.   Thus, in accordance with the foregoing, JUDGMENT will be entered (1)   declaring that the January 1 start date for petition signature collection in R.I. Gen. Laws § 17-1-2(9)(iii) is unconstitutional; and (2) permanently enjoining Defendants from enforcing or applying the start date set forth in § 17-1-2(9)(iii) as a ground for rejecting or refusing to certify signatures collected by the Moderate Party for inclusion on the official Rhode Island election ballot in 2010.[20]

IT IS SO ORDERED.

_William E. Smith_

William E. Smith
United States District Judge
Date: 5/29/09

---

[20] This decision moots Defendants' Motion for Judgment on the Pleadings and Motion for Dismissal per Fed. R. Civ. P. 52.